Traci TOWNSER, Appellant,

v.

FIRST DATA CORP., Respondent.

No. ED 87619.

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 16, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 20, 2007.

238 

Thomas M. Kendrick, St. Louis, MO, for appellant.

John P. Kafoury, St. Louis, MO, for respondent.

NANNETTE A. BAKER, Judge.

### Introduction

Traci Townser ("Employee") appeals from the judgment of the Labor and Industrial Relations Commission ("Commission") affirming the decision of the administrative law judge ("ALJ") in favor of her former employer, First Data Corporation ("Employer") on her claim for disability compensation for carpal tunnel syndrome. The Commission found, in a two to one decision, that the ALJ's decision was supported by competent and substantial evidence. We reverse and remand.

### Factual and Procedural Background

Employee began working part-time for Employer in June 1995. She became a

full-time employee in October 1995. After she became a full-time employee, she worked forty hours per week and often worked overtime. From 1995 until 2001, Employee was a customer service representative for departments she described as: "credit card money transfers," "credit card validation" and "agent sending money transfers." While she was working in these departments, her job duties included typing. Employee was responsible for typing the names, addresses, phone numbers and verifications for each transaction on which she worked. During this time, Employee worked in various cubicles and did not have her own work station.

In 2000, Employee notified Employer that she had intermittent pain and discomfort in her upper right extremity. Employer sent her for an examination by Dr. David Brown and she underwent various tests, including a "nerve conduction" test. The results of the tests were negative and Dr. Brown's report states that the cause of her symptoms was not clear. She was cleared to work with no restrictions. No further treatment was recommended, but Employee purchased a splint which she wore when she was experiencing pain or discomfort.

In 2001, Employee moved to a specialized department she called "benefits quick cash." She described her typing duties in the "benefits quick cash" department as "a little more intense" in that every action she took required her to record "comments" by typing them into the account. Employee testified that she had to enter more data in the "benefits quick cash" specialty than she had in the "credit card validation" specialty. She also worked overtime four out of five days per week.

She received a permanent workstation in this department, which was similar to workstations she had used previously. On her desk in the "benefits quick cash" de-partment, her computer was at the back of the desk, the keyboard was in front of the computer and a padded wrist-rest was placed directly in front of the keyboard. Employee testified that she could not move the position of the keyboard or wrist-rest and that the positioning of the keyboard caused discomfort in her wrists. In 2001, Employer made minor changes to the edge of her desk that were not associated with her complaints and did not relieve her discomfort.

In April 2002, Employee's symptoms had worsened. The pain became more consistent and she experienced discomfort in her wrists on a daily basis. Initially, the pain did not radiate. Employee notified Employer and Employer sent her to have another "nerve conduction" test. Dr. Daniel Phillips performed the test and found that the results were consistent with "very mild right median sensory neuropathy across the carpal tunnel." She also visited Dr. Skeik Zahid. At this point, Employee had developed a lump on her wrist. Dr. Zahid issued a report in July 2002 with the following assessment:

Assessment:

1. Ganglion Cyst-wrist. 727.43. Not work related.

2. H/O right sensory CTS. Very mild

. . .

Dr. Zahid advised Employee to see her primary care physician "regarding a non-work related condition." He instructed Employee to return to the clinic as needed. He also instructed Employee to wear a wrist splint when she experienced discomfort.

Employee's symptoms continued to worsen. She started feeling tingling in the fingers, and the pain radiated up her arm toward her elbow. Employer referred her to Dr. Evan Crandall, a hand specialist, in the fall of 2002. Dr. Crandall reviewed the

study done by Dr. Phillips. He noted that Dr. Phillips had "read the study as very mild; however, that was only based on the interlatency differences. Really, the values are *normal*." Dr. Crandall recommended that the nerve study be repeated and a keystroke analysis and ergonomic analysis be performed.

Employee underwent another nerve study in May 2003. Dr. Crandall stated in a letter on July 8, 2003, regarding the results of the nerve study, "The values were very similar to those over a year ago and consistent with very mild carpal tunnel syndrome based only on the interlatency differences. The absolute values are still within normal limits." Dr. Crandall recommended treatment without surgery. He also stated "Based upon her job description and the ergonomic keystroke analysis, it would not be possible for her job to have caused her very mild carpal tunnel syndrome."

In September 2003, Employee was examined by Dr. Raymond Cohen. Dr. Cohen diagnosed Employee with "overuse disorder of the right upper extremity up through 5–20–02 (cumulative trauma disorder, repetitive trauma disorder)" and "right carpal tunnel syndrome." He concluded that the injury resulted from her work and that her work was a substantial factor in her disability. Dr. Cohen determined that Employee had a 25% permanent partial disability at the level of the right wrist. He recommended surgery.

Employee consulted Dr. S. Vic Glogovac in December 2003. Dr. Glogovac diagnosed right carpal tunnel syndrome and right cubital tunnel syndrome. Dr. Glogovac performed a surgical decompression of Employee's right carpal tunnel and the right cubital tunnel on December 9, 2003.

On March 12, 2004, Jennifer Christy, an industrial engineer, conducted an ergonomic study of Employer's customer service department. Specifically, Christy studied the "quick collect" specialty and the "credit card validation" specialty. She did not test Employee or study the "benefits quick cash" specialty. She found that the customer service representatives' maximum keystroke exposure was 56 percent below the "suggested rate." She concluded that the repetitions performed by the tested individuals would not place them at risk for cumulative trauma.

In June 2004, after reviewing Christy's ergonomic job analysis, Dr. Crandall sent a letter to Employer again stating that Employee's carpal tunnel syndrome was not caused by her work. He stated that the keystroke analysis showed that Employee had a "low level" volume of typing and, in his opinion, the job would be considered "intermittent" typing.

Employee filed a claim for compensation with the Missouri Division of Workers Compensation on May 21, 2002. Her claim was denied. The case was tried before an ALJ on February 8, 2005. The ALJ denied compensation, entering findings of fact and conclusions of law, and Employee filed an application for review to the Commission. In a two to one decision, the Commission entered a final award denying compensation, affirming the decision of the ALJ and incorporating the decision into the final award. Employee appealed.

### Standard of Review

Section 287.495.1 RSMo (2000) sets forth our standard of review. Pursuant to the statute, we may only modify, reverse, remand or set aside the Commission's award upon the following grounds:

(1) That the Commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the Commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

In *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003), the Missouri Supreme Court determined that we no longer view the evidence in the light most favorable to the Commission's award. Rather, we consider the evidence in the context of the whole record to determine whether it contains sufficient competent and substantial evidence to support the award, or whether the award is contrary to the overwhelming weight of the evidence. *Id.* at 222–23. We must affirm the Commission's decision unless it was contrary to the overwhelming weight of the evidence. *Id.* at 223.

While this court defers to the Commission on issues of fact, questions of law are reviewed *de novo. Endicott v. Display Technologies, Inc.*, 77 S.W.3d 612, 615 (Mo. 2002). In reviewing a workers' compensation award, we review the findings of the Commission and not those of the ALJ. *Sutton v. Vee Jay Cement Contracting Co.*, 37 S.W.3d 803, 807 (Mo.App. E.D.2000) (*overruled on other grounds by Hampton*, 121 S.W.3d 220). When, as here, the Commission affirms or adopts the findings of the ALJ, we review the decision and findings of the ALJ as adopted by the Commission. *Id.*

### Discussion

Employee claims in her sole point on appeal that the Commission erred because the ALJ's decision was not based on competent and substantial evidence because the evidence showed that work was a substantial factor in the cause of her injury; and that the Commission erred in applying Section 287.067.7,[1] the "three month rule," because there was only one employer in the cause of action. Employer argues that Employee did not establish that her carpal tunnel syndrome was caused by the conditions in her workplace.

■■■ An occupational disease is an identifiable disease arising without human fault out of and in the course of the employment. Section 287.067. In order to support a finding of occupational disease, the employee must provide substantial and competent evidence that he has contracted an occupationally induced disease rather than an ordinary disease of life. *Kelley v. Banta & Stude Construction Co. Inc.*, 1 S.W.3d 43, 48 (Mo.App. E.D.1999). The inquiry involves two considerations: (1) whether there was an exposure to the disease which was greater than or different from that which affects the public generally, and (2) whether there was a recognizable link between the disease and some distinctive feature of the employee's job which is common to all jobs of that sort. *Id.* Carpal tunnel syndrome is an occupational disease. *Id.* Employer does not contest that Employee was diagnosed with carpal tunnel syndrome. Instead, Employer argues that Employee did not prove that the disease was caused by her occupation.

■■ "An employee shall be conclusively deemed to have been exposed to the hazards of an occupational disease when for any length of time, however short, he is employed in an occupation or process in which the hazard of the disease exists ..." Section 287.063. Claimants have the burden to prove causation of an occupational disease. *Grime v. Altec Industries*, 83 S.W.3d 581, 583 (Mo.App. W.D.2002) (*overruled on other grounds by Hampton*, 121 S.W.3d 220). "The disease need not to

1. All statutory references are to RSMo.2000 unless otherwise indicated.

have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence." Section 287.067.1.

The claimant must establish, generally through expert testimony, the probability that the occupational disease was caused by conditions in the work place. *Kelley,* 1 S.W.3d at 48. Such conditions need not be the sole cause of the disease, so long as they are a substantial contributing factor. *Id.* A single medical opinion will support a finding of compensability even where the causes of the disease are indeterminate. *Id.* The opinion may be based on a written report alone. *Id.*

Where the opinions of medical experts are in conflict, the fact-finding body determines whose opinion is the most credible. *Id.* We will affirm the decision of the Commission to accept one of two conflicting medical opinions if that decision is supported by substantial and competent evidence. *Russell v. Invensys Cooking and Refrigeration,* 174 S.W.3d 15, 23 (Mo. App. S.D.2005). The Commission is charged with determining the credibility of witnesses and the acceptance or rejection of testimony cannot be disturbed on review unless it is against the overwhelming weight of the evidence. *Hall v. Wagner Div.–McGraw–Edison,* 755 S.W.2d 594, 596 (Mo.App. E.D.1988) (*overruled on other grounds by Hampton,* 121 S.W.3d 220).

Respondent argues that we should defer to the findings of the Commission, but upon review we find Commission made multiple findings of fact that were not supported by substantial evidence. The Commission relied on Dr. Zahid's July 22, 2002, report, finding that Dr. Zahid "determined that [Employee's] condition was not work-related." However, careful examination of the report reveals that Dr. Zahid

made no such finding. Dr. Zahid's report contains the following entry:

Assessment:

1. Ganglion cyst—wrist. 727.23 Not work related.

2. H/O right sensory CTS. Very mild.

Dr. Zahid's report also states that "the mechanism of injury was repetitive use of upper extremities." Dr. Zahid instructed Employee to continue wearing the splint, and to see her primary care physician regarding "a non-work related condition," the ganglion cyst. Clearly, Dr. Zahid determined that the *ganglion cyst* was not work related. However, Dr. Zahid did not find that the "CTS" or carpal tunnel syndrome was not work related. Indeed, it appears from the report that Dr. Zahid noted her history of carpal tunnel syndrome but did not determine whether it was a "work related" condition. Thus, the Commission's finding that Dr. Zahid determined that the condition was not work related was not supported by substantial and competent evidence.

The Commission also found that Employee could not prove that her symptoms were work related because she started experiencing symptoms "suddenly" after five years. Furthermore, the Commission further stated that Employee had "many years of exposure with no symptoms." The Commission also determined that Employee's exposure was essentially unchanged since 1995. None of these findings are supported by substantial evidence. First, Dr. Crandall's November 12, 2002, report states that Employee began experiencing symptoms in 1998, only three years after she began working for Employer. Also, Employee testified that her exposure to repetitive motion has changed since she was hired because her job duties within the customer service area have changed over the

years. Finally, there is no expert opinion evidence finding that the onset of symptoms is so remote from the commencement of exposure to call causation into question. Thus, this finding is not supported by the evidence.

The Commission also relies heavily on ergonomic analysis. The Commission cites to the Christy ergonomic study as well as Dr. Crandall's opinion based on that study. The Commission determined that Dr. Cohen's opinion was not probative because Dr. Cohen did not base it on an ergonomic study. The Commission's heavy reliance on the Christy ergonomic study is misplaced for two reasons.

First, the study has little relevance to the case at hand. In completing her study, Christy examined the "quick collect" and the "credit card validation" specialties during a normal shift, without taking into account overtime. The record reflects Employee most recently worked in "benefits quick cash," where she worked a significant amount of overtime. Furthermore, during her tenure at First Data, Employee never worked in the "quick collect" specialty. Employee has not worked in the "credit card validation" specialty since 2001, when she moved to "benefits quick cash." Indeed, most of Employee's complaints occurred after she moved to "benefits quick cash," which Employee described in her testimony as "more intense" because that specialty required more typing than the other specialties in which she worked before. But, the Christy study did not include an ergonomic analysis of the "benefits quick cash" specialty. In fact, the only evidence about the duties of the "benefits quick cash" specialty was from Employee's testimony. Employer did not provide a job description, ergo-

nomic study or other evidence regarding Employee's duties in the "benefits quick cash" specialty. The Commission did not make a specific finding that Employee's testimony regarding the increased intensity of her typing duties in "benefits quick cash" should be disbelieved. Thus, we find ourselves faced with one of those "rare" cases where the Commission's decision is contrary to the overwhelming weight of the evidence. See *Gibson–Knox v. Classic Print,* 184 S.W.3d 201, 202 (Mo. App. S.D.2006). The Commission also relied on Dr. Crandall's November 12, 2002, and July 8, 2003, reports in which Dr. Crandall opined that the condition was not work-related based on Employee's job description[2] and "the ergonomic keystroke analysis ...." However, the Christy ergonomic study was not completed until well after Dr. Crandall issued these reports. Thus, the reports could not be based on the ergonomic study on the record.

Second, the Commission determined that Employee did not prove causation by probative evidence because Dr. Cohen's opinion was not based on an ergonomic study and, alternatively, Dr. Crandall's opinion was more probative because it was based on an ergonomic study. There is no requirement in Missouri that expert opinion regarding causation of an occupational disease be based on an ergonomic study. It is true that Employee has the burden to prove causation of an occupational disease, *Grime,* 83 S.W.3d at 583, but the Commission elevated Employee's burden of proof by essentially requiring that her expert rely on an ergonomic study in order for his opinion to be considered probative. Under the applicable statutes, Employee must prove that the disease *"had its origin in a risk connected with*

---

**2.** Dr. Crandall states that his opinion is also based on Employee's "job description." However, Employee has had multiple jobs requiring computer use throughout her em-

ployment at First Data Corp., and Dr. Crandall does not specify upon which job description he is basing his opinion.

*the employment*" and that the disease flowed from that source as a rational consequence. Section 287.067.1 (emphasis added). The Commission's dismissal of Dr. Cohen's opinion solely on the basis that he lacked an ergonomic study is a misapplication of the appropriate law.

Also, in its opinion, the Commission relied on Section 287.067.7, finding "the legislature *limits employer liability* for hand symptoms which do not result from a single accident to those cases only in which the symptoms result from 'repetitive motion.'" (emphasis added). This statute does not "limit liability for hand symptoms" in the way the Commission implies. The statute cited limits employer liability for exposure to repetitive motion when the employee has been employed less than three months and the evidence establishes that repetitive motion at a prior employer was the substantial contributing factor to the injury. The "limit" imposed by the legislature is not a general limit for repetitive motion cases, but is applied for very specific circumstances when the Employee has changed jobs. The "three month rule" is not applicable to this case because Employee was employed by Employer well more than three months before filing her claim. As the dissenting Commissioner noted, the Commission's citation to this section is "inexplicable."

Respondent relies on *Aldridge v. Southern Missouri Gas Co.*, 131 S.W.3d 876 (Mo.App. S.D.2004), stating that deference must be afforded to the Commission on issues concerning the credibility and weight to be given to conflicting evidence. However, in this case, the issue is not one of credibility and weight to be given to the experts; the issue is that the Commission's decision was not supported by credible evidence and the Commission erred as a matter of law in elevating Employee's burden of proof by essentially requiring an ergonomic study and applying Section 287.067.7 to attempt to limit recovery for repetitive motion cases. Therefore, *Aldridge* is distinguishable from and inapplicable to the case at hand.

Upon review of the entire record, it is apparent that the Commission's decision is not supported by substantial and competent evidence. From the record as a whole, it appears that Employee's carpal tunnel syndrome "has its origin in a risk connected with the employment" and flowed from her employment as a "rational consequence." Employee's evidence and testimony established that she was employed in an occupation in which the hazards of carpal tunnel exist and thus, under Section 287.063, she has been exposed to the hazards of an occupational disease. We reverse and remand for further proceedings consistent with this opinion.

CLIFFORD H. AHRENS, P.J., and MARY K. HOFF, J., concur.